## IN THE UNITED SATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2,<br><br>                Plaintiffs,<br><br>    V.<br><br>SHAWNEE HOLDING, INC. d/b/a<br>SHAWNEE INN & GOLF RESORT,<br>and JEROMY WO,<br><br>Defendants. | Civil Action No.<br><br><br>COMPLAINT AND<br>JURY DEMAND |

## **PARTIES**

1.　　Plaintiff, Jane Doe 1 (hereinafter, "Doe 1"), is an adult individual who resides at 341 Ridge Circle, Cresco, Monroe County, Pennsylvania, 18326.

2.　　Plaintiff, Jane Doe 2 (hereinafter, "Doe 2"), is an adult individual, and at all relevant times herein was the legal spouse of Doe 1, and resides at 341 Ridge Circle, Cresco, Monroe County, Pennsylvania, 18326　　.

3.　　Defendant, Shawnee Holding, Inc., d/b/a Shawnee Inn & Golf Resort (hereinafter "Shawnee" or "Defendant"), is a Pennsylvania corporation, registered at 1 River Road, P.O. Box 67, Shawnee, Monroe County, PA, 18356, which regularly conducts business in the state of Pennsylvania and has a principal place of business at 100 Shawnee Inn Drive, Shawnee on Delaware, Pennsylvania 18356

1

4.     Defendant, Jeromy Wo (hereafter "Defendant Wo"), is an adult individual residing at 2105 Wallace Street, Stroudsburg, Monroe County, Pennsylvania, 18360.

5.     Shawnee was at all times relevant, Doe 1's employer where she was last employed as an Art Director.

6.     At all relevant times Defendant Wo was Doe 1's direct supervisor.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over Doe 1's claims pursuant to 28 U.S.C. §1331 because the claims present a federal question.

8.     Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Doe 1 and Doe 2's state-law claims, as those claims arise out of the same set of operative facts as the federal claims.

9.     Venue is proper pursuant to 28 U.S.C. §1391(b)(l)-(2) because Defendant resides in and/or conducts business in this judicial district, and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

10.    At all times relevant hereto, Defendant employed fifteen (15) or more persons for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

11.     Doe 1 has exhausted all administrative remedies. A Notice of Right-to-Sue from the Equal Employment Opportunity Commission ("EEOC") is attached hereto as Exhibit "A."

## RELEVANT FACTS

12.     All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth at length herein.

13.     Doe 1 was hired on or around March 15, 2007, as Graphic Designer/Web Administrator at the Shawnee Inn & Golf Resort, a position she was qualified for based on her extensive experience in art direction and graphic design.

14.     Doe 1 is a female.

15.     Doe 1 was subjected to a hostile environment/harassment based on gender stereotyping, gender identity, and/or sex, which was severe and/or pervasive enough to alter the conditions of her work environment and make it more difficult for her to do the job, to wit:

> a. Beginning around July 2014, at the time he was promoted, Doe 1 shared a small office with her direct supervisor, Mr. Jeromy Wo (hereinafter "Mr. Wo"). At that time, Mr. Wo began a course of conduct by which he would commute to work via bicycle. Accordingly, Mr. Wo, on a daily basis, would arrive to work wearing cycling attire, enter the small office he shared only with Doe 1, close the door behind him, strip down to his underwear and change into his work clothes, all while Doe 1 was present. At the conclusion of the work day, Mr. Wo would then reverse the process, stripping down to his underwear in front of Doe 1 in order to change

into his cycle attire. This continued until approximately April 2019. On multiple occasions other co-workers walked-in and observed Mr. Wo's behavior. Additionally, Doe 1 showed the General Manager, where Mr. Wo stored his clothing in their shared office. As a result of this behavior, Doe 1 repeatedly asked to be moved to another office location. These requests were denied on the basis that no other spaces were available. However, during the same period of time Doe 1 made her multiple requests, other co-workers' relocation requests were accommodated.

b. In or about October 2019, a groom who was holding his wedding at Shawnee, allegedly sexually assaulted/raped a bridesmaid prior to the wedding in a locker-room at Shawnee. When Doe 1 raised concerns that she felt nervous about being alone in the locker-rooms where women had been sexually assaulted, Tamara, the office manager, said that "[Doe 1] must have been 'jelly' [jealous] of the rape victim. Mr. Wo, laughed at Tamara's comment and then stated, "yea, you're just jealous it was not you!"

c. On many occasions during Doe 1's course of employment, Mr. Wo would talk about being "elbow deep" in work. When Doe 1 asked Mr. Wo if he meant "knee deep in work," Mr. Wo. Replied, "no I mean elbow deep," and held up his arms to demonstrate a motion intended to mimic the sexual act of "fisting."

d. On multiple occasions during Doe 1's course of employment, while they were in their shared office space, with only Doe 1 and Mr. Wo present, Mr. Wo would ask Doe 1 questions of a sexual nature. By way of example, Mr. Wo would routinely ask questions including, but not limited to, about gay and lesbian sexual behavior. This would extend to questions regarding how often lesbian couples engage in oral sex, how often they manually stimulate each other and if all gay men enjoyed anal intercourse. These questions

often included accompanying hand gestures by Mr. Wo. Furthermore, Mr. Wo would often talk about the size of women's breasts and made it known to Doe 1 and her co-workers that he had a propensity for women with large breasts.

e. On many occasions during Doe 1's employment, while they were in their shared office space, with only Doe 1 and Mr. Wo present, Mr. Wo would ask Doe 1 if she could tell if a fellow co-workers or client was lesbian or gay. To mask such inquiries, Mr. Wo would often use thinly veiled reference such as, is [that co-worker or client] "a friend of Dorothy," which Mr. Wo understood as inquiring about sexual orientation. Such conversations often included Mr. Wo commenting on gender and/or sexual orientation stereotypes such as mannerisms, hobbies, sound of their voice and manner of dress.

f. On multiple occasions during Doe 1's employment, while Mr. Wo was introducing new co-workers, Mr. Wo would make a point to mention Doe 1's sexual orientation to the new co-worker. Often this would be done directly or by referencing the fact that Doe 1 was married to a woman.

16.    Doe 1 rebuffed and tried complaining about the harassment to the Human Recourses department (hereinafter "HR") on multiple occasions and the General Manager, Rob Howell, however, the harassment did not stop.

17.    Subsequent to one incident when Doe 1 complained to the General Manager, she was written up for taking her concerns directly to Mr. Howell.

5

18.     This was in direct contradiction to the prevailing Equal Opportunity

policy at Shawnee at the time which states in pertinent part:

> Any employee who experiences harassment should,
> without fear of retaliation, bring it to the attention of his or
> her department head, supervisor, manager, the executive
> office, the <u>general manager</u>, or the Human Resources
> Office.

> [Emphasis added]

19.     In fact, Doe 1 was instructed that all of her complaints/concerns of

harassment must first be brought to Mr. Wo, her direct supervisor and main harasser,

who would then decide if her complaints should be taken to the HR department.

20.     On the occasions that Doe 1 independently alerted HR of the persisting

harassment, no action was taken by HR or anyone else at Shawnee to remedy the

harassment.

21.     To the contrary, subsequent to Doe 1 alerting HR to the harassment,

Mr. Wo was permitted to conduct Doe 1's performance review, which was

performed face-to-face, with only Doe 1 and Mr. Wo present.

22.     At that time and for the first time in her employment history with

Defendant, Doe 1 was given a negative performance review and denied a three

percent (3%) raise.

23.     Furthermore, during the aforementioned review, Mr. Wo stated, if Doe 1 "fell in line" and did everything by the book, including not giving Mr. Wo any more trouble, Doe 1's three percent (3%) raise would be reassessed.

24.     Moreover, following her discussion with the General Manager in 2016, Doe 1 was instructed that Mr. Wo, her main harasser, must be carbon-copied on every e-mail correspondence that Doe 1 sent moving forward.

25.     Additionally, Mr. Wo, informed Doe 1 that he had to unilaterally approve all of her work product before it was shared with anyone else either inside or outside the company.

26.     Mr. Wo acting as the gatekeeper for all of Doe 1's work product and communications was in direct contradiction to the previous instruction given to Doe 1 and negatively impacted her ability to efficiently and effectively conduct her job.

27.      Additionally, Defendant's act/omission were in direct violation of the prevailing Shawnee Harassments Free Workplace Policy, which states in pertinent part:

> The Shawnee Inn and Golf Resort has a policy of prohibiting unlawful and unwanted harassment in any form by managers, supervisors and co-workers. All employees are expected to avoid any behavior or conduct toward other employees that could be interpreted or perceived as unlawful or unwanted harassment. Shawnee also is committed to protecting employees from unlawful or unwanted harassment by visitors, vendors or guests.
>
> Under Shawnee's policy, unlawful or unwanted harassment may consist of unwelcome conduct – whether verbal, visual or physical – that is based on a person's sex,

color, race, ancestry, national origin, citizenship status, religion, age, disability, medical condition, veteran status, marital status, sexual orientation or other legally-protected status. Please note that under Shawnee's policy, the prohibitions against unwanted harassment generally are broader than the legal requirements imposed by federal, state, and local laws.

Sexual harassment has gained special attention in the press in recent years. Shawnee's policy absolutely prohibits sexual harassment. The Equal Employment Opportunity Commission (EEOC) defines sexual harassment to include "unwelcome sexual advances, requests for sexual favors and other verbal and physical conduct of a sexual nature." Unlawful sexual harassment generally falls into two categories: (1) where the conduct is made a condition of employment (as where a supervisor requires an employee to engage in conduct of a sexual nature in order to retain the employee's job) and (2) where the conduct creates an intimidating, hostile or offensive working environment.

Sexual harassment that may create a hostile working environment may include:

- Sexually-oriented verbal kidding or sexual teasing;
- Repeated offensive sexual flirtations, advances or propositions;
- Continued or repeated verbal abuse of a sexual nature;
- Graphic or degrading comments about an individual's appearance;
- Display of sexually suggestive objects of pictures;
- Repeated subtle pressure for sexual activity; or
- Physical contact such as patting, hugging, pinching or brushing against another employee's body.

If you feel at any time that you are being harassed in any manner by a supervisor, co-worker or visitor, or that you have witnessed the harassment of another employee, you should notify your Department Head in addition to the Director of Human Resources, or the General Manager.

AS A SHAWNEE EMPLOYEE, YOU HAVE AN OBLIGATION TO REPORT ALL INSTANCES OF HARASSMENT THAT YOU EXPERIENCE OR WITNESS! The company cannot deal with problems unless we know about them.

All allegations or complaints of harassment will be fully investigated. Any employee who may have information regarding the allegations is expected to cooperate fully with any investigation. Shawnee will preserve the identity and confidentiality of any employees reporting complaints of harassment or who cooperate with any investigations to the extent the investigation permits. Employees who report complaints of harassment or who cooperate in any investigation of those complaints will be protected from any retaliatory actions. Allegations of unlawful or unwanted harassment that are found to have merit may result in discipline of the offender, up to and including dismissal.

28.     As a direct result of the aforementioned acts/omissions by Defendant, Doe 1, experienced and continues to experience both mental and physical injuries.

29.     As a direct result of the aforementioned acts/omissions by Defendant, Doe 1, experienced and continues to undergo medical and psychological care for both mental and physical injuries.

## COUNT I
### HOSTILE WORK ENVIRONMENT/HARASSMENT BASED ON SEX/GENDER STEREOTYPING IN VIOLATION OF THE TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, *et., seq.*
### (Plaintiff, Jane Doe 1 v. Defendant Shawnee)

30.     All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth at length herein.

31.     Doe 1 was hired in or around March 15, 2007, as a Graphic Designer/Web Administrator at the Shawnee Inn & Golf Resort, a position she was qualified for based on her extensive experience in art direction and graphic design.

32.     Doe 1 is a female.

33.     Doe 1 was subjected to a hostile environment/harassment based on gender stereotyping, gender identity, and/or sex, which was severe and/or pervasive enough to alter the conditions of her work environment and make it more difficult for her to do the job, to wit:

> a.   Beginning around July 2014, at the time he was promoted, Doe 1 shared a small office with her direct supervisor, Mr. Jeromy Wo (hereinafter "Mr. Wo"). At that time, Mr. Wo began a course of conduct by which he would commute to work via bicycle. Accordingly, Mr. Wo, on a daily basis, would arrive to work wearing cycling attire, enter the small office he shared only with Doe 1, close the door behind him, strip down to his underwear and change into his work clothes, all while Doe 1 was present. At the conclusion of the work day, Mr. Wo would then reverse the process, stripping down to his underwear in front of Doe 1 in order to change into his cycle attire. This continued until approximately April 2019. On multiple occasions other co-workers walked-in and observed Mr. Wo's behavior. Additionally, Doe 1 showed the General Manager, where Mr. Wo stored his clothing in their shared office. As a result of this behavior, Doe 1 repeatedly asked to be moved to another office location. These requests were denied on the basis that no other spaces were available. However, during the same period of time Doe 1 made her multiple requests, other co-workers' relocation requests were accommodated.

b. In or about October 2019, a groom who was holding his wedding at Shawnee, allegedly sexually assaulted/raped a bridesmaid prior to the wedding in a locker-room at Shawnee. When Doe 1 raised concerns that she felt nervous about being alone in the locker-rooms where women had been sexually assaulted, Tamara, the office manager, said that "[Doe 1] must have been 'jelly' [jealous] of the rape victim. Mr. Wo, laughed at Tamara's comment and then stated, "yea, you're just jealous it was not you!"

c. On many occasions during Doe 1's course of employment, Mr. Wo would talk about being "elbow deep" in work. When Doe 1 asked Mr. Wo if he meant "knee deep in work," Mr. Wo. Replied, "no I mean elbow deep," and held up his arms to demonstrate a motion intended to mimic the sexual act of "fisting."

d. On multiple occasions during Doe 1's course of employment, while they were in their shared office space, with only Doe 1 and Mr. Wo present, Mr. Wo would ask Doe 1 questions of a sexual nature. By way of example, Mr. Wo would routinely ask questions including, but not limited to, about gay and lesbian sexual behavior. This would extend to questions regarding how often lesbian couples engage in oral sex, how often they manually stimulate each other and if all gay men enjoyed anal intercourse. These questions often included accompanying hand gestures by Mr. Wo. Furthermore, Mr. Wo would often talk about the size of women's breasts and made it known to Doe 1 and her co-workers that he had a propensity for women with large breasts.

e. On many occasions during Doe 1's employment, while they were in their shared office space, with only Doe 1 and Mr. Wo present, Mr. Wo would ask Doe 1 if she could tell if a fellow co-workers or client was lesbian or gay. To mask such inquiries, Mr. Wo would often use thinly veiled reference such as, is [that co-worker

or client] "a friend of Dorothy," which Mr. Wo
understood as inquiring about sexual orientation. Such
conversations often included Mr. Wo commenting on
gender and/or sexual orientation stereotypes such as
mannerisms, hobbies, sound of their voice and manner
of dress.

f.  On multiple occasions during Doe 1's employment,
while Mr. Wo was introducing new co-workers, Mr.
Wo would make a point to mention Doe 1's sexual
orientation to the new co-worker. Often this would be
done directly or by referencing the fact that Doe 1 was
married to a woman.

34.  Doe 1 rebuffed and complained about the harassment to the Human

Recourses department (hereinafter "HR") on multiple occasions and the General

Manager, Rob Howell, however, the harassment did not stop.

35.  Subsequent to one incident when Doe 1 complained to the General

Manager, she was written up for taking her concerns directly to Mr. Howell.

36.  This was in direct contradiction to the prevailing Equal Opportunity

policy at Shawnee at the time which states in pertinent part:

> Any employee who experiences harassment should,
> without fear of retaliation, bring it to the attention of his or
> her department head, supervisor, manager, the executive
> office, the general manager, or the Human Resources
> Office.
> [Emphasis added]

37.  In fact, Doe 1 was instructed that all of her complaints/concerns of

harassment must first be brought to Mr. Wo, her direct supervisor and main harasser,

who would then decide if her complaints should be taken to the HR department.

38.     On the occasions that Doe 1 independently alerted HR of the persisting harassment, no action was taken by HR or anyone else at Shawnee to remedy the harassment.

39.     To the contrary, subsequent to Doe 1 alerting HR to the harassment, Mr. Wo was permitted to conduct Doe 1's performance review, which was performed face-to-face, with only Doe 1 and Mr. Wo present.

40.     At that time and for the first time in her employment history with Defendant, Doe 1 was given a negative performance review and denied a three percent (3%) raise.

41.     Furthermore, during the aforementioned review, Mr. Wo stated, if Doe 1 "fell in line" and did everything by the book, including not giving Mr. Wo any more trouble, Doe 1's three percent (3%) raise would be reassessed.

42.     Moreover, following her discussion with the General Manager in 2016, Doe 1 was instructed that Mr. Wo, her main harasser, must be carbon-copied on every e-mail correspondence that Doe 1 sent moving forward.

43.     Additionally, Mr. Wo, informed Doe 1 that he had to unilaterally approve all of her work product before it was shared with anyone else either inside or outside the company.

44.     Mr. Wo acting as the gatekeeper for all of Doe 1's work product and communications was in direct contradiction to the previous instruction given to Doe 1 and negatively impacted her ability to efficiently and effectively conduct her job.

45.     Additionally, Defendant's act/omission were in direct violation of the prevailing Shawnee Harassments Free Workplace Policy, which states in pertinent part:

> The Shawnee Inn and Golf Resort has a policy of prohibiting unlawful and unwanted harassment in any form by managers, supervisors and co-workers. All employees are expected to avoid any behavior or conduct toward other employees that could be interpreted or perceived as unlawful or unwanted harassment. Shawnee also is committed to protecting employees from unlawful or unwanted harassment by visitors, vendors or guests.
>
> Under Shawnee's policy, unlawful or unwanted harassment may consist of unwelcome conduct – whether verbal, visual or physical – that is based on a person's sex, color, race, ancestry, national origin, citizenship status, religion, age, disability, medical condition, veteran status, marital status, sexual orientation or other legally-protected status. Please note that under Shawnee's policy, the prohibitions against unwanted harassment generally are broader than the legal requirements imposed by federal, state, and local laws.
>
> Sexual harassment has gained special attention in the press in recent years. Shawnee's policy absolutely prohibits sexual harassment. The Equal Employment Opportunity Commission (EEOC) defines sexual harassment to include "unwelcome sexual advances, requests for sexual favors and other verbal and physical conduct of a sexual nature." Unlawful sexual harassment generally falls into two categories: (1) where the conduct is made a condition of employment (as where a supervisor requires an employee to engage in conduct of a sexual nature in order to retain

the employee's job) and (2) where the conduct creates an intimidating, hostile or offensive working environment.

Sexual harassment that may create a hostile working environment may include:

- Sexually-oriented verbal kidding or sexual teasing;
- Repeated offensive sexual flirtations, advances or propositions;
- Continued or repeated verbal abuse of a sexual nature;
- Graphic or degrading comments about an individual's appearance;
- Display of sexually suggestive objects of pictures;
- Repeated subtle pressure for sexual activity; or
- Physical contact such as patting, hugging, pinching or brushing against another employee's body.

If you feel at any time that you are being harassed in any manner by a supervisor, co-worker or visitor, or that you have witnessed the harassment of another employee, you should notify your Department Head in addition to the Director of Human Resources, or the General Manager. AS A SHAWNEE EMPLOYEE, YOU HAVE AN OBLIGATION TO REPORT ALL INSTANCES OF HARASSMENT THAT YOU EXPERIENCE OR WITNESS! The company cannot deal with problems unless we know about them.

All allegations or complaints of harassment will be fully investigated. Any employee who may have information regarding the allegations is expected to cooperate fully with any investigation. Shawnee will preserve the identity and confidentiality of any employees reporting complaints of harassment or who cooperate with any investigations to the extent the investigation permits. Employees who report complaints of harassment or who cooperate in any investigation of those complaints will be protected from any retaliatory actions. Allegations of unlawful or unwanted harassment that are found to have merit may

15

result in discipline of the offender, up to and including dismissal.

46.    As a direct result of the aforementioned acts/omissions by Defendant, Doe 1, experienced and continues to experience both mental and physical injuries.

47.    As a direct result of the aforementioned acts/omissions by Defendant, Doe 1, experienced both mental and physical injuries and continues to undergo medical and psychological care for both mental and physical injuries.

**COUNT II**
**WRONGFUL DISCHARGE BASED ON SEX/GENDER IN VIOLATION**
**OF THE TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e, *et. seq*.**
**(Plaintiff, Jane Doe 1 v. Defendant Shawnee)**

48.    All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth at length herein.

49.    As a direct result of the aforementioned actions/omissions of Defendant and those set forth below, Doe 1, was instructed by her medical care professionals to seek new employment as the persistent harassment was negatively impacting both her mental and physical health.

50.    Accordingly, Defendant Shawnee forced Doe 1 to resign on account of sex, gender stereotyping, and/or gender identity. The facts that support this are as follows:

      a.  Beginning around July 2014, at the time he was promoted, Doe 1 shared a small office with her direct supervisor, Mr.

Jeromy Wo (hereinafter "Mr. Wo"). At that time, Mr. Wo began a course of conduct by which he would commute to work via bicycle. Accordingly, Mr. Wo, on a daily basis, would arrive to work wearing cycling attire, enter the small office he shared only with Doe 1, close the door behind him, strip down to his underwear and change into his work clothes, all while Doe 1 was present. At the conclusion of the work day, Mr. Wo would then reverse the process, stripping down to his underwear in front of Doe 1 in order to change into his cycle attire. This continued until approximately April 2019. On multiple occasions other co-workers walked-in and observed Mr. Wo's behavior. Additionally, Doe 1 showed the General Manager, where Mr. Wo stored his clothing in their shared office. As a result of this behavior, Doe 1 repeatedly asked to be moved to another office location. These requests were denied on the basis that no other spaces were available. However, during the same period of time Doe 1 made her multiple requests, other co-workers' relocation request were accommodated.

b.   In or about October 2019, a groom who was holding his wedding at Shawnee, allegedly sexually assaulted/raped a bridesmaid prior to the wedding in a locker-room at Shawnee. When Doe 1 raised concerns that she felt nervous about being alone in the locker-rooms where women had been sexually assaulted, Tamara, the office manager, said that "[Doe 1] must have been 'jelly' [jealous] of the rape victim. Mr. Wo, laughed at Tamara's comment and then stated, "yea, you're just jealous it was not you!"

c.   On many occasions during Doe 1's course of employment, Mr. Wo would talk about being "elbow deep" in work. When Doe 1 asked Mr. Wo if he meant "knee deep in work," Mr. Wo. Replied, "no I mean elbow deep," and held up his arms to demonstrate a motion intended to mimic the sexual act of "fisting."

d. On multiple occasions during Doe 1's course of employment, while they were in their shared office space, with only Doe 1 and Mr. Wo present, Mr. Wo would ask Doe 1 questions of a sexual nature. By way of example, Mr. Wo would routinely ask questions including, but not limited to, about gay and lesbian sexual behavior. This would extend to questions regarding how often lesbian couples engage in oral sex, how often they manually stimulate each other and if all gay men enjoyed anal intercourse. These questions often included accompanying hand gestures by Mr. Wo. Furthermore, Mr. Wo would often talk about the size of women's breasts and made it known to Doe 1 and her co-workers that he had a propensity for women with large breasts.

e. On many occasions during Doe 1's employment, while they were in their shared office space, with only Doe 1 and Mr. Wo present, Mr. Wo would ask Doe 1 if she could tell if a fellow co-workers or client was lesbian or gay. To mask such inquiries, Mr. Wo would often use thinly veiled reference such as, is [that co-worker or client] "a friend of Dorothy," which Mr. Wo understood as inquiring about sexual orientation. Such conversations often included Mr. Wo commenting on gender and/or sexual orientation stereotypes such as mannerisms, hobbies, sound of their voice and manner of dress.

f. On multiple occasions during Doe 1's employment, while Mr. Wo was introducing new co-workers, Mr. Wo would make a point to mention Doe 1's sexual orientation to the new co-worker. Often this would be done directly or by referencing the fact that Doe 1 was married to a woman.

51.    Doe 1 rebuffed and complained about the harassment to the Human Recourses department (hereinafter "HR") on multiple occasions and the General Manager, Rob Howell, however, the harassment did not stop.

52.    Subsequent to one incident when Doe 1 complained to the General Manager, she was written up for taking her concerns directly to Mr. Howell.

53.    This was in direct contradiction to the prevailing Equal Opportunity policy at Shawnee at the time which states in pertinent part:

> Any employee who experiences harassment should, without fear of retaliation, bring it to the attention of his or her department head, supervisor, manager, the executive office, the general manager, or the Human Resources Office.

54.    In fact, Doe 1 was instructed that all of her complaints/concerns of harassment must first be brought to Mr. Wo, her direct supervisor and main harasser, who would then decide if her complaints should be taken to the HR department.

55.    On the occasions that Doe 1 independently alerted HR of the persisting harassment, no action was taken by HR or anyone else at Shawnee to remedy the harassment.

56.    To the contrary, subsequent to Doe 1 alerting HR to the harassment, Mr. Wo was permitted to conduct Doe 1's performance review, which was performed face-to-face, with only Doe 1 and Mr. Wo.

57.     At that time and for the first time in her employment history with Defendant, Doe 1 was given a negative performance review and denied a three percent (3%) raise.

58.     Furthermore, during the aforementioned review, Mr. Wo stated, if Doe 1 "fell in line" and did everything by the book, including not giving Mr. Wo any more trouble, Doe 1's three percent (3%) raise would be reassessed.

59.     Furthermore, following her discussion with the General Manager in 2016, Doe 1 was instructed that Mr. Wo, her main harasser, must be carbon-copied on every e-mail correspondence that Doe 1 sent moving forward.

60.     Additionally, Mr. Wo, informed Doe 1 that he had to unilaterally approve all of her work product before it was shared with anyone else either inside or outside the company.

61.     Mr. Wo acting as the gatekeeper for all of Doe 1's work product and communications was in direct contradiction to the previous instruction given to Doe 1 and negatively impacted her ability to efficiently and effectively conduct her job.

62.     The acts and omissions by Defendant are in direct violation of the prevailing Shawnee Anti-Harassments Policy.

63.     The prevailing Shawnee Anti-Harassment Policy states, in pertinent part:

> The Shawnee Inn and Golf Resort has a policy of
> prohibiting unlawful and unwanted harassment in any

form by managers, supervisors and co-workers. All employees are expected to avoid any behavior or conduct toward other employees that could be interpreted or perceived as unlawful or unwanted harassment. Shawnee also is committed to protecting employees from unlawful or unwanted harassment by visitors, vendors or guests.

Under Shawnee's policy, unlawful or unwanted harassment may consist of unwelcome conduct – whether verbal, visual or physical – that is based on a person's sex, color, race, ancestry, national origin, citizenship status, religion, age, disability, medical condition, veteran status, marital status, sexual orientation or other legally-protected status. Please note that under Shawnee's policy, the prohibitions against unwanted harassment generally are broader than the legal requirements imposed by federal, state, and local laws.

Sexual harassment has gained special attention in the press in recent years. Shawnee's policy absolutely prohibits sexual harassment. The Equal Employment Opportunity Commission (EEOC) defines sexual harassment to include "unwelcome sexual advances, requests for sexual favors and other verbal and physical conduct of a sexual nature." Unlawful sexual harassment generally falls into two categories: (1) where the conduct is made a condition of employment (as where a supervisor requires an employee to engage in conduct of a sexual nature in order to retain the employee's job) and (2) where the conduct creates an intimidating, hostile or offensive working environment.

Sexual harassment that may create a hostile working environment may include:

- Sexually-oriented verbal kidding or sexual teasing;
- Repeated offensive sexual flirtations, advances or propositions;
- Continued or repeated verbal abuse of a sexual nature;
- Graphic or degrading comments about an individual's appearance;
- Display of sexually suggestive objects of pictures;
- Repeated subtle pressure for sexual activity; or

- Physical contact such as patting, hugging, pinching or brushing against another employee's body.

If you feel at any time that you are being harassed in any manner by a supervisor, co-worker or visitor, or that you have witnessed the harassment of another employee, you should notify your Department Head in addition to the Director of Human Resources, or the General Manager. AS A SHAWNEE EMPLOYEE, YOU HAVE AN OBLIGATION TO REPORT ALL INSTANCES OF HARASSMENT THAT YOU EXPERIENCE OR WITNESS! The company cannot deal with problems unless we know about them.

All allegations or complaints of harassment will be fully investigated. Any employee who may have information regarding the allegations is expected to cooperate fully with any investigation. Shawnee will preserve the identity and confidentiality of any employees reporting complaints of harassment or who cooperate with any investigations to the extent the investigation permits. Employees who report complaints of harassment or who cooperate in any investigation of those complaints will be protected from any retaliatory actions. Allegations of unlawful or unwanted harassment that are found to have merit may result in discipline of the offender, up to and including dismissal.

64.     As a direct result of the aforementioned acts/omissions by Defendant, Doe 1, experienced both mental and physical injuries and continues to undergo medical and psychological care for both mental and physical injuries.

## COUNT III
## RETALIATORY DISCHARGE BASED ON SEX/GENDER IN VIOLATION OF THE TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, *et. seq*. (Plaintiff, Jane Doe 1 v. Defendant Shawnee)

65.    All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth at length herein.

66.    As a direct result of the aforementioned actions/omissions of Defendant and those set forth below, Doe 1, was instructed by her medical care professionals to seek new employment as the persistent harassment was negatively impacting both her mental and physical health.

67.    Defendant Shawnee forced Doe 1 to resign in retaliation for Doe 1's rebuffs of and harassment by employees based on Doe's sex, gender identity, and/or gender stereotyping, and Doe's complaints about the same. The facts which support this are as follows:

      a. Beginning around July 2014, at the time he was promoted, Doe 1 shared a small office with her direct supervisor, Mr. Jeromy Wo (hereinafter "Mr. Wo"). At that time, Mr. Wo began a course of conduct by which he would commute to work via bicycle. Accordingly, Mr. Wo, on a daily basis, would arrive to work wearing cycling attire, enter the small office he shared only with Doe 1, close the door behind him, strip down to his underwear and change into his work clothes, all while Doe 1 was present. At the conclusion of the work day, Mr. Wo would then reverse the process, stripping down to his underwear in front of Doe 1 in order to change into his cycle attire. This continued until approximately April 2019. On multiple

occasions other co-workers walked-in and observed Mr. Wo's behavior. Additionally, Doe 1 showed the General Manager, where Mr. Wo stored his clothing in their shared office. As a result of this behavior, Doe 1 repeatedly asked to be moved to another office location. These requests were denied on the basis that no other spaces were available. However, during the same period of time Doe 1 made her multiple requests, other co-workers' relocation requests were accommodated.

b.  In or about October 2019, a groom who was holding his wedding at Shawnee, allegedly sexually assaulted/raped a bridesmaid prior to the wedding in a locker-room at Shawnee. When Doe 1 raised concerns that she felt nervous about being alone in the locker-rooms where women had been sexually assaulted, Tamara, the office manager, said that "[Doe 1] must have been 'jelly' [jealous] of the rape victim. Mr. Wo, laughed at Tamara's comment and then stated, "yea, you're just jealous it was not you!"

c.  On many occasions during Doe 1's course of employment, Mr. Wo would talk about being "elbow deep" in work. When Doe 1 asked Mr. Wo if he meant "knee deep in work," Mr. Wo. Replied, "no I mean elbow deep," and held up his arms to demonstrate a motion intended to mimic the sexual act of "fisting."

d.  On multiple occasions during Doe 1's course of employment, while they were in their shared office space, with only Doe 1 and Mr. Wo present, Mr. Wo would ask Doe 1 questions of a sexual nature. By way of example, Mr. Wo would routinely ask questions including, but not limited to, about gay and lesbian sexual behavior. This would extend to questions regarding how often lesbian couples engage in oral sex, how often they manually stimulate each other and if all gay men enjoyed anal intercourse. These questions often included accompanying hand gestures by Mr. Wo. Furthermore, Mr. Wo would often talk about the

size of women's breasts and made it known to Doe 1 and her co-workers that he had a propensity for women with large breasts.

e. On many occasions during Doe 1's employment, while they were in their shared office space, with only Doe 1 and Mr. Wo present, Mr. Wo would ask Doe 1 if she could tell if a fellow co-workers or client was lesbian or gay. To mask such inquiries, Mr. Wo would often use thinly veiled reference such as, is [that co-worker or client] "a friend of Dorothy," which Mr. Wo understood as inquiring about sexual orientation. Such conversations often included Mr. Wo commenting on gender and/or sexual orientation stereotypes such as mannerisms, hobbies, sound of their voice and manner of dress.

f. On multiple occasions during Doe 1's employment, while Mr. Wo was introducing new co-workers, Mr. Wo would make a point to mention Doe 1's sexual orientation to the new co-worker. Often this would be done directly or by referencing the fact that Doe 1 was married to a woman.

68.   Doe 1 rebuffed and complained about the harassment to the Human Resources Department on multiple occasions and the General Manager, Rob Howell, however the harassment did not stop.

69.   Subsequent to one incident when Doe 1 complained to the General Manager, she was written up for taking her concerns directly to Mr. Howell.

70.   This was in direct contradiction to the prevailing Equal Opportunity policy at Shawnee at the time which states in pertinent part:

Any employee who experiences harassment should, without fear of retaliation, bring it to the attention of his or

> her department head, supervisor, manager, the executive
> office, the general manager, or the Human Resources
> Office.

71.     In fact, Doe 1 was instructed that all of her complaints/concerns of

harassment must first be brought to Mr. Wo, her direct supervisor and main harasser,

who would then decide if her complaints should be taken to the HR department.

72.     On the occasions that Doe 1 independently alerted HR of the persisting

harassment, no action was taken by HR or anyone else at Shawnee to remedy the

harassment.

73.     To the contrary, subsequent to Doe 1 alerting HR to the harassment,

Mr. Wo was permitted to conduct Doe 1's performance review, which was

performed face-to-face, with only Doe 1 and Mr. Wo.

74.     At that time and for the first time in her employment history with

Defendant, Doe 1 was given a negative performance review and denied a three

percent (3%) raise.

75.     Furthermore, during the aforementioned review, Mr. Wo stated, if Doe

1 "fell in line" and did everything by the book, including not giving Mr. Wo any

more trouble, Doe 1's three percent (3%) raise would be reassessed.

76.     Moreover, following her discussion with the General Manager in 2016,

Doe 1 was instructed that Mr. Wo, her main harasser, must be carbon-copied on

every e-mail correspondence that Doe 1 sent moving forward.

77.    Additionally, Mr. Wo, informed Doe 1 that he had to unilaterally approve all of her work product before it was shared with anyone else either inside or outside the company.

78.    Mr. Wo acting as the gatekeeper for all of Doe 1's work product and communications was in direct contradiction to the previous instruction given to Doe 1 and negatively impacted her ability to efficiently and effectively conduct her job.

79.    As a direct result of the aforementioned acts/omissions by Defendant, Doe 1, experienced both mental and physical injuries and continues to undergo medical and psychological care for both mental and physical injuries.

**COUNT IV**
**Aiding and Abetting** – **Pennsylvania Human Relations Act (PHRA) § 955(d-e)**
**(Plaintiff, Jane Doe 1 v. Defendant Jeromy Wo)**

80.    All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth at length herein.

81.    At all times relevant, Defendant Wo was Doe 1's direct supervisor.

82.    At all times relevant, Defendant Wo had knowledge of conduct and/or participated in conducted which constituted a hostile work environment for Doe 1.

83.    At all times relevant, despite his knowledge of and/or creation of a hostile work environment, as it relates to Doe 1, Defendant Wo failed to take remedial action to prevent harassment of Doe 1.

84.   Accordingly, Defendant Wo's acts/omissions against Doe 1 and in furtherance of his ongoing harassment against Doe 1 constitute aiding and abetting pursuant to Pennsylvania Human Relations Act (PHRA) § 955(d-e); and thereby, a violation of the same.

85.   As a direct result of the aforementioned acts/omissions by Defendant Wo, Doe 1, experienced both mental and physical injuries and continues to undergo medical and psychological care for both mental and physical injuries.

<u>**COUNT V**</u>
**Retaliation – Pennsylvania Human Relations Act (PHRA) § 955(d-e)**
<u>**(Plaintiff, Jane Doe 1 v. Defendant Jeromy Wo)**</u>

86.   All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth at length herein.

87.   At all times relevant, Doe 1 was engaged in protected employment activity.

88.   As is set forth above, Defendant Wo, took adverse action against Doe 1 based on her engagement in protected activity as defined by 42 U.S.C.A. § 2000e-3(a).

89.   Accordingly, Defendant Wo's acts/omissions against Doe 1 and in furtherance of his ongoing harassment against Doe 1, subsequent to Doe 1's initiating a complaint regarding Defendant Wo's harassing behavior, constitutes

retaliatory action pursuant to Pennsylvania Human Relations Act (PHRA) § 955(d-e); and thereby, a violation of the same.

90.     As a direct result of the aforementioned acts/omissions by Defendant, Doe 1, experienced both mental and physical injuries and continues to undergo medical and psychological care for both mental and physical injuries.

**COUNT VI**
**Intentional Infliction of Emotional Distress – Pennsylvania Law**
**(Plaintiff, Jane Doe 2 v. Defendant Jeromy Wo)**

91.     All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth at length herein.

92.     Doe 1, due to the intentional and/or reckless acts of Defendant Wo, has been caused to suffer severe emotional distress.

93.     The conduct of Defendant Wo, as set forth above, is extreme and outrageous.

94.     Doe 1's severe emotional distress was the direct result of the aforementioned conduct of Defendant Wo.

95.     The severe emotional distress suffered by Doe 1 as a direct result of the intentional, extreme and outrageous conduct of Defendants, has caused Doe 1 to suffer and continue to suffer mental distress.

96.     The severe emotional distress suffered by Doe 1 as a direct result of the intentional, extreme and outrageous conduct of Defendants, has caused Doe 1 to

suffer and continue to undergo both medical and psychological treatment for her distress.

## COUNT VII
### Loss of Consortium – Pennsylvania Law
### (Plaintiff, Jane Doe 2 v. Defendant)

97.    All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth at length herein.

98.    Plaintiff, Jane Doe 2, is the lawful wife of Plaintiff, Jane Doe 1.

99.    As a result of Defendant's acts and/or omissions, Plaintiff, Doe 2, has and will continue to be deprived of the services, assistance and companionship of her wife.

100.   As a result of Defendant's acts and/or omissions, Plaintiff, Doe 2, has and will continue to expend sums of money for her wife's related mental health treatment/medication.

## PRAYER FOR RELIEF

101.   Pursuant to 42 U.S.C. § 2000e, et. seq., Plaintiff, Jane Doe 1, demands judgment in her favor and against Defendant Shawnee for an amount that willfully and fairly compensates Doe 1 for any and all back and front pay, overtime, seniority, benefits, bonuses, commissions, and any promotions Doe 1 would have received.

102.    Pursuant to 42 U.S.C. § 2000e, et. seq., Plaintiff, Jane Doe 1, demands judgment in her favor and against Defendant Shawnee for compensatory damages

for pain and suffering, mental anguish, anxiety, depression, humiliation, embarrassment, and emotional distress.

103.   Pursuant to 42 U.S.C. § 2000e, et. seq., Plaintiff, Jane Doe 1, due to the malice and/or reckless indifference of Defendant Shawnee and their intentional discrimination of Doe 1, demands judgment in her favor and against Defendant Shawnee for punitive damages.

104.   Pursuant to 42 U.S.C. § 2000e, et. seq., Plaintiff, Jane Doe 1, demands judgment in her favor and against Defendant Shawnee for pre- and post-judgment interest.

105.   Pursuant to 42 U.S.C. § 2000e, et. seq., Plaintiff, Jane Doe 1, demands judgment in her favor and against Defendant Shawnee for reasonable attorneys' fees and costs of suit.

106.   Pursuant to 42 U.S.C. § 2000e, et. seq., Plaintiff, Jane Doe 1, demands judgment in her favor and against Defendant Shawnee for equitable/injunctive relief requiring that Defendant provide a neutral employment reference for Doe 1; to adopt, post, and disseminate a non-discrimination and anti-harassment policy; to provide appropriate training; and for Defendant to post notice of the verdict in this matter at the Shawnee Inn and Golf Resort.

107.   Pursuant to the Pennsylvania Human Relations Act (PHRA) § 955(d-e), Doe 1 demands judgment in her favor and against Defendant Wo for compensatory damages and pain and suffering.

108.   Pursuant to the Pennsylvania Human Relations Act (PHRA), Doe 1 demands judgment in her favor and against Defendant Wo for compensatory damages and pain and suffering. *Pennsylvania Human Relations Commission v. Zamantakis*, 387 A.2d 70 (Pa. 1978)

109.   Pursuant to the Pennsylvania Human Relations Act (PHRA) 43 P.S. § 962(c)(2), Doe 1 demands judgment in her favor and against Defendant Wo for reasonable attorney's fees and costs.

110.   Pursuant to Pennsylvania law, Plaintiff, Jane Doe 1, demands judgment in her favor and against Defendant Wo for compensatory damages for intentional inflection of emotional distress.

111.   Pursuant to Pennsylvania law, Plaintiff, Jane Doe 2, demands judgment in her favor and against Defendant Wo for compensatory damages for pain and suffering, mental anguish, anxiety, depression, humiliation, embarrassment, and emotional distress.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury.


GROSS MCGINLEY, LLP

Dated:  June 11, 2021            By:  s/Adrian K. Cousens
                                     ANNE K. MANLEY, ESQUIRE
                                     I.D. No. 51857
                                     ADRIAN K. COUSENS, ESQUIRE
                                     I.D. No. 320197
                                     *Attorneys for Plaintiffs*
                                     33 South 7th Street
                                     P.O. Box 4060
                                     Allentown, PA 18105
                                     Phone: 610-820-5450
                                     Fax:    610-820-6006
                                     amanley@grossmcginley.com
                                     acousens@grossmcginley.com